UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
IN THE MATTER OF THE PETITION OF
FIRE ISLAND FERRIES, INC., AS
OWNER OF THE COURIER FOR THE               MEMORANDUM & ORDER
EXONERATION FROM AND LIMITATION            11-CV-3475 (DRH)(ARL)
OF LIABILITY
-------------------------------X
A P P E A R A N C E S :

For Petitioner Fire Island Ferries, Inc.:
     Nicoletti Hornig & Sweeney
     Wall Street Plaza
     88 Pine Street
     7th Floor
     New York, New York 10005-1801
          By: David R. Hornig, Esq.
              Guerric S.D.L. Russell, Esq.

For Claimants Diaz, Vourdouris, Bustamonti and Ghany:
     Dougherty, Ryan, Giuffra, Zambito
     & Hession
     250 Park Avenue
     Seventh Floor
     New York, New York 10177
       By: John Joseph Hession, Esq.

For Claimant LaPera:
     Russo, Karl, Widmaier & Cordano, PLLC
     400 Town Line Road
     Hauppauge, New York 11786
       By: John C. Tonetti, Esq.

     Law Office of Leroy S. Corsa
     1 Woodpath Drive
     Northport, New York 11768
       By: Leroy S. Corsa, Esq.

HURLEY, Senior District Judge

          By complaint filed on July 19, 2011, Fire Island

Ferries Inc. ("Petitioner" or "FIF") seeks exoneration from

liability or, if found at fault, to limit its liability to the

value of its vessel.

          The underlying action arises from a July 10, 2011

collision on the Great South Bay, just north of Atlantique, Fire
Island, New York, between a pleasure craft, the My Day Off Too
("MDOT") and the Courier, a commercial water taxi owned by
Petitioner.  A bench trial was held before the undersigned on
September 19, 20, 21, 23 and December 6, 2016 to determine the
merits of the Courier's application.

      The purpose of this decision is to provide my Findings
of Fact and Conclusions of Law as required by Federal Rule of
Civil Procedure 52.

<u>Format of Decision</u>

      By way of format, a brief, largely undisputed, overview
of the collision between the MDOT and the Courier, will be
provided, followed by the contentions of the parties and the
applicable law.  Against that backdrop, detailed findings of fact
and concomitant conclusions of law will be furnished vis-a-vis
the adverse positions advanced by the parties.

<u>Part I – Largely Undisputed Facts Pertaining to the Collision</u>

      1.  As noted, the subject collision occurred on July
10, 2011.  The Courier, with Captain Yolando Vannoni ("Vannoni")
at the helm, left the Fire Island community of "Kismet at 2:30
[A.M.]" (Tr. at 440), then went to the neighboring village of
"Saltaire," which was only a "[m]inute[;] two [or] three" away.
(<u>Id.</u> at 440-41.)  At Saltaire, he "picked up a passenger and
headed back . . . east" towards "Ocean Bay Park" (<u>id.</u> at 441),

via the "Slew Way."  The Slew Way is a commonly used unmarked navigation route with more than adequate depth to accommodate, inter alia, water taxies such as the Courier which measured 36' by 12',(id. at 411).

2.  Captain Vannoni had used the Slew Way for around "25 years" prior to the subject accident (tr. at 445), and had previously "made [the] run from Saltaire to Ocean Beach . . . more than a hundred [but less than] a thousand" times.  (Id. at 449.)

In any event, on this date just before 2:36 A.M., the Courier was about to collide with the MDOT.  As explained by Vannoni:

> I left Saltaire heading northeast-bound up the slew way towards buoy number ten, almost getting ready to turn into my turn for ten, is when on the radar I visually addressed the same target as a boat going across my bow from starboard to port.  I visually saw the boat, visually saw lights, navigation lights. Looked back down at the radar, GPS and – you know, my normal process.
>
> And at that moment I saw the bow of another boat.  It was a white hull.
>
> I immediately turned the wheel as hard as I could to port and pulled back at the throttles at the same time.  Made impact.
>
> At this point I'm not moving, or moving minimally, not under any power, of course — I think maybe the engines are stalled at this point — and noticed that the boat that was impacted is off to my starboard now kind of circling.

(Tr. at 450-51.)

3. The vessel Vannoni saw going across his bow from starboard to port was not the MDOT. Rather it "was a[n unknown] boat in front of" the MDOT that claimant Anastasio Vourdouris ("Vourdouris"), the skipper of the MDOT, was following in an effort to reach the "State Channel." (Tr. at 205.) As to that vessel, Vourdouris testified that "once I spotted that boat . . . I decided to follow him because I figured that would be a safe way to get out, you know, to maybe follow someone else." (Id.)

The second boat referenced in the above excerpt from Vannoni's testimony, viz. the one with a "white hull," was the MDOT which Vannoni did not see until an instant before the two vessels made contact.

4. Apparently at about the same time the Courier was leaving Saltaire, MDOT, a 20½ Grady-White owned and operated by claimant Vourdouris (tr. at 196), departed from Ocean Beach (id. at 201) heading "north, northwest" towards "Captree" State Park on the mainland. (Id. at 205.)

While Vourdouris was following the unknown vessel, one of his four passengers aboard the MDOT, claimant Kevin Diaz ("Diaz"), "tried to warn the driver" (tr. at 304) "a few seconds"[1] prior to impact, id. at 305, of a vessel approaching

---

[1] Diaz, on cross-examination, agreed that the number of seconds was "between five to ten" and that he told Vourdouris "a couple of times 'on your left' prior to the collision." (Tr. at

"on the left." (Id. at 206.)  Vourdouris looked to his left, then "to [his] right" but saw nothing.  (Id.) As he returned his head to a straight ahead position, the Courier "was right on top of [him]" and "hit [the MDOT] on [the] left side, right on [the] red [navigational] light."  (Id. at 207.)

5.  Immediately prior to the collision, the Courier was traveling at about "24 miles per hour" and the MDOT at slightly over 20 miles per hour.  (Id. at 788.)  Aboard the Courier, besides Vannoni and two passengers, was "deckhand" Caroline Curtin ("Curtin").  (Id. at 602.)  Traveling with Vourdouris were his friends and co-claimants Diaz, Daniel Bustamonti ("Bustamonti"), Jennifer Ghany ("Ghany") and Paul LaPera ("LaPera").  The weather during the evening of July 9th and the early morning of July 10th was clear and the water calm.  (Id. at 433 (Vannoni: "It was clear, very [c]lear, very calm"), 351 (claimant's expert Bates: "[the vessels] collided at night in clear visibility").)

Part II — Contentions of Parties

A.  FIF's Position

Petitioner FIF contends that the operator of the MDOT "was solely at fault" for the collision on July 10, 2011.  (FIF's Proposed Findings of Fact and Conclusions of Law (Doc. # 119) at p. 36.)  That is so, petitioner posits, because (1) the MDOT's

_____

331.)

"navigation lights were not on at the time of the collision"(id. at p. 34), (2) the operator of the MDOT "was so focused on following [the] unknown vessel at a speed in excess of twenty (20) miles per hour that he never saw the Courier or took any action whatsoever to avoid a collision" (id. at p. 35), and (3) Vourdouris "failed to keep a proper lookout." (Id. at p. 36.)

Petitioner further maintains that "[i]n the alternative, if the Court concludes that Captain Vannoni was negligent, and that his negligence is imputable to Fire Island Ferries, Inc., . . . Fire Island Ferries, Inc. did not have privity or knowledge of such negligence" (id. at p. 38), and, accordingly, FIF as the owner of the Courier, is entitled to have its potential liability to claimants capped at the market value of the vessel.[2]

B.  Claimants' Positions

Claimants Vourdouris, Diaz, Bustamonti and Ghany "contend that the collision . . . was due solely to the . . . negligence" of the Courier's operator, Vannoni, absent any "comparative negligence on the part of the operator of the [MDOT]." (PTO at 7.)  Claimant LaPera takes a less categorical position "contending that the aforesaid collision was at least 90% the fault of the operator of the water taxi with some fault

_____

[2]  The parties have stipulated that the value of the Courier was $200,000.  Amended Joint Pre-Trial Order (Doc. # 87)("PTO") at 15.

on the part of the operator of the [MDOT]."  (Id.)

Claimants, from the inception of the litigation, have ascribed a litany of negligent acts and omissions to Vannoni and FIF.  (See, e.g., PTO at 6.)  Some of those theories were never adequately developed at trial (such as, e.g., proceeding at a "high rate of speed in unmarked channels") to warrant further discussion.  Other arguments, though pursued at trial, fell far short of being convincing.  Included within that category is, for instance, Captain Bates' testimony about Vannoni's supposedly improperly limiting the radar range to a half mile (tr. at 351-53).[3]  What remains for determination as to the numerous positions urged by claimants are whether (1) Vannoni was "sending a text message on his cell phone at or about the time [the Courier] struck the MDOT" (Claimant LaPera's Reply to FIF's Proposed Findings of Fact and Conclusions of Law (Doc. # 122) at 1), (2) was there a lookout aboard the Courier, and (3) to the extent questions (1) or (2) is answered in the affirmative, is FIF's exposure limited to the value of the Courier?

---

[3]  Petitioner made an after-the-fact Federal Rule of Civil Procedure 26 objection to this portion of Bates' testimony, maintaining that the issue of "range" was absent from his written expert report and was never broached during his deposition.  In response, I said that although petitioner seemed to have the better side of the argument, I would reserve decision until claimants' attorneys had a chance to review the deposition transcript and we discussed the matter further.  (Tr. at 354-56.) I don't recall any such further discussion being conducted. Assuming that to be the case, the contested "range" testimony as things now stand remains part of the record.

Before supplementing the background findings of fact set forth in Part I by making additional factual findings vis-a-vis the above listed disputed issues as framed by the parties, a brief review of the applicable law will be provided.

## Part III — Applicable Law

The law governing FIF's petition is well synopsized in the following excerpt from <u>Holzhauer v. Golden Gate Bridge Highway and Transportation District</u>, a district court decision from the Northern District of California:

> The Limitation of Liability Act, 46 U.S.C. §§ 30505 <u>et seq.</u>, allows a vessel owner to limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel.  First, the plaintiff or claimant must establish what act or condition caused the loss.  Next, the shipowner has the burden of proving that the act or condition was outside its privity or knowledge. . . . If the shipowner meets this burden, the owner's liability is limited to the value of the ship.  If the shipowner's liability is limited to the value of the vessel, that amount becomes a fund from which all claims against the shipowner must be paid.
>                     . . . .
> The first step in analyzing a petition for limitation of liability is to determine the negligent act or unseaworthy condition that caused the plaintiffs' harm.  The . . . claimant bears the burden of establishing this element. . . .
>                         . . . .
> The second step is for the Court to determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness that caused the accident.

2016 WL 7242108, at *2-3 (N.D. Cal. Dec. 15, 2016)(internal
citations and quotations marks omitted).

### Part IV — Discussion and Concomitant Findings of Fact on Disputed Issues[4]

Given that the first step in addressing FIF's petition
involves claimants "establish[ing] what act or condition caused
the loss," claimants' allegations against FIF will be discussed
initially.  Which is to say, the position of the parties as set
forth in Part II will be analyzed essentially in reverse order.

### A. Claimant's Have Established That the Operator of the Courier was Texting When the Collision Occurred[5]

(6) At 2:36 A.M. on July 10, 2011, a text message from
Vannoni's cell phone was received by his friend and co-worker
Brian McNicholas ("McNicholas").  (See Tr. at 134:3-4, 137:2-8,
478:17-22; see also Claimants' Ex. I (Verizon Wireless Record).)

(7) The pivotal question, discussed infra, is whether
the above referenced text was sent by Vannoni "a few
milliseconds" prior its receipt (tr. at 581:9-13) — as claimants
contend — or "minutes, or even hours" earlier as FIF maintains
(id. at 566:3-18).  Vannoni insists that he was not texting at

---

    [4]  In this portion of the decision concerning disputed
issues of fact, cites to the trial transcript will include both
pages and lines rather than just pages as in Part I.

    [5]  In this part of the decision, i.e. Part IV, Findings of
Fact 6 through 37 are provided.  The reader is reminded that
Findings of Fact 1 through 5 are set forth in Part I supra.

the time of the accident.  (Id. at 474:5-7, 477:14 to 478:2.)

(8) In support of its position, FIF called Roger L. Boyell ("Boyell") to the stand in an effort to show that Vannoni may have texted McNicholas sometime considerably earlier in the evening than a moment before 2:36 A.M.

Boyell, a New Jersey licensed electrical engineer and private investigator, was retained "to investigate the capabilities of a cell phone sending a text message under conditions that may have obtained at the time of the incident." (Tr. at 556:9-13 (emphasis added).)  At trial, he explained, based on his examination of the phone used by Vannoni or one of the same make and model – to wit, "a Casio . . . flip phone" (id. at 558:3-4), – that 2:36 A.M. "is not necessarily the time at which the phone was manipulated or the keyboard operated to compose that message.  That is only the time at which the network observed the connection and the transmission." (Id. at 565:16 to 566:2.)[6]  "We know that the user operated the phone before the

_____

[6]  Claimants' attorney Hession moved to strike Boyell's testimony about Vannoni's "Casio . . . flip phone" (tr. 558:3-4), on the basis Boyell's testing was done on the assumption that "the phone was not connected to a network" (id. at 559:3-9), an assumption not rooted in the evidence.  I received the evidence subject to connection under Fed. R. of Evid. 104(b).

While no direct evidence was thereafter elicited of Vannoni endeavoring to use his cell phone while in a dead zone, Boyell's testimony was helpful to the Court in explaining how a significant delay conceivably could occur between the time a Casio flip phone user hits the send button on the one hand and the time the intended recipient receives the message and the

2:36 A.M. transmission.  We don't know how many seconds or

minutes or even hours before . . . ."[7]  (Id. at 566:8-11.)

Boyell explained the process that occurs when the user

of the subject cell phone tries to send a text while in a dead

zone thusly:

> If there is no network connection, this
> phone does not attempt to transmit a text
> message but displays, quote, Would you like
> to send when digital service is available,

---

carrier records the transaction on the other.  To that extent,
the expert's testimony was germane vis-a-vis FIF's theory on the
point and its accompanying "dead zones" proof, sparse as it was.
Accordingly, claimants' motion to strike is denied.

[7]  The proposition that the text could remain unsent for
"hours" under the hypothetical scenario presented by Boyell is
rendered problematic via the following clarifying testimony from
the same source:

> A . . . . And the phone having queued the message
>   transmits it without user attention.  It
>   then reports the message was sent.  And
>   that is the point at which the network
>   recognizes the message has been transmitted.
>   Not the point at which the user manipulated
>   the phone, but the point at which it comes
>   back into contact with the network.
>
> Q And that could be minutes or hours,
>   wherever it connects back to the
>   digital network.
>
>   Is that correct?
>
> A Yes, it's at least minutes.  I don't
>   know if this particular phone will hold
>   that queue for more than many minutes
>   because I just didn't time it, but it's
>   a matter of minutes.

(Tr. at 573:8-21.)

end quote.

> Pressing no cancels the message. While
> pressing yes, holds the message ready to
> send. If yes, the message is transmitted
> when the phone next connects to the network.
> This requires no user input . . . .

(Tr. at 572:6-14.)

9. But tellingly absent from Vannoni's testimony is any information to the effect that he endeavored to send a text to McNicholas prior to 2:36 A.M. but that his effort was met by the inquiry: "Would you like to send the message when digital service is available." That message, according to Boyell, would have materialized quickly after contact with the send button was made and, once appearing, would last "several minutes." (Tr. at 564:3 to 565:7.) And even if, hypothetically speaking, such a phone message appeared but was unseen by Vannoni, his nonresponse presumably would result in the intended text being deleted from the cell phone's queue thereby precluding its subsequent transmission upon contact being made with a cell tower.

Understandably, Boyell was unable to offer an opinion as to the interval separating contact with the send button and receipt of the text. (Tr. at 566:3-18.) Was it a milliseconds or minutes? For it to be measured in other than milliseconds, transmission had to be attempted initially in a dead zone. But as to that critical subject, Boyell, notwithstanding his obvious expertise, was essentially silent. He made reference to articles

he read about transmission problems on Fire Island and to
purported testimony by Vannoni about such problems.  But,
proceeding in reverse order, Vannoni did not testify before me
about the subject beyond saying "[t]here are spots on Fire Island
and in the Great South Bay that are known to . . . lack . . .
really solid surface [sic]" (presumably should read "service");
and the article Boyell mentioned attributed Fire Island coverage
problems "to Superstorm Sandy which wiped out a portion of the
island." (Id. at 567:9-15.)  Sandy, however, post-dated July 10,
2011.

10.  Other efforts by FIF to provide the necessary
predicate for its hypothesis about a delayed transmission of
Vannoni's text to McNicholas were similarly unavailing.  For
instance, Timothy Mooney ("Mooney"), "the president and owner of
Fire Island Ferries" (tr. at 656:3-4), opined that "[w]ith regard
to Kismet and Saltaire, it seems we were on the outer fringe of
reception with regard to cell service." (Id. at 669:15-17.)  But
that testimony by its very nature is insufficient to support the
theory advanced by FIF.

11.  It is undisputed that Vannoni used his cell phone
for personal purposes during his July 9th - July 10th tour of
duty.  He called his "daughters," and his "girlfriend,"[8] among

---

[8]  Vannoni was in cell phone contact with his girlfriend's
telephone number eight times during his July 9th - July 10th
tour.  (Tr. at 496:3 to 497:5.)

others.  (Tr. at 482:9-16.)  Single contacts as long as five and eight minutes are listed on the Verizon records.  In some instances during the early morning hours of July 10th, Vannoni acknowledges that he may have used his "cell phone while the vessel was underway."  (Id. at 480:11-18.)  He insisted, however, that he did not use his cell phone in the interim between leaving Saltaire and point of impact near Buoy 10.  (Id. at 481:6-9.)

12.  Andrew Park, previously with Verizon as its "director of Network engineering and operations" (tr. at 147:12-25), testified via prior deposition, that there were no complaints "on July 10, 2011 regarding the service in the vicinity of Fire Island."  (Id. at 179:4-10.)  Given the totality of the evidence including what Vannoni had to say – and did not say – on the subject, FIF's theory that he encountered transmission problems is best characterized as rank speculation.

13.  In sum, Verizon's records reflect that Vannoni sent a text message at 2:36 A.M.  No countervailing evidence from any source is to be found in the trial transcript demonstrating that a delay in transmission – while technically possible – actually occurred separating the time the message was composed and the send button activated and the message's receipt at 2:36 A.M.  Accordingly, the Court concludes that it is more likely than not that Vannoni was in the process of texting at the

time of the collision,[9] notwithstanding his disclaimers to the contrary.

14.   The question arises whether Vannoni's texting was a proximate cause of the injuries alleged by claimants.  That inquiry brings to the fore FIF's contention that the MDOT — traveling without illuminated navigation lights — was nondetectable to the Courier's radar given the obscuring wake, or trail behind the vessel MDOT was following.  To the extent true, the collision by Buoy 10 arguably would have occurred even if Vannoni was not texting at the virtual moment of impact.

It does not take an expert to appreciate that the dimensions of the wake caused by a moving vessel depends on multiple factors.  Among those factors is the vessel's size; by way of hyperbole, a motorized canoe will generate less water displacement than a naval destroyer both traveling at the same speed.  And the speed of the lead vessel is also germane. Similarly, the visual impairment, if any, attributable to a wake

_____

[9]   Parenthetically, the above finding of fact was reached after evaluating all relevant evidence including the testimony of Courier deckhand Caroline Curtin.  On direct, she testified that, while in close proximity to Vannoni, she observed him during the brief trip from Saltaire to Buoy 10 and never saw him use his cell phone.  (Tr. at 606:4-18.)  But on cross-examination, she answered "I don't recall" to the following question: "Is it your contention that you had Captain Vannoni under continuous observation, say [for] two minutes before the collision"?  (Id. at 609:4-7.)  The same answer, "I don't recall," was given to a number of related questions, so much so that her testimony viewed in toto was afforded de minimus weight.  (Id. at 609:13 to 610:9.)

upon a third-party observer or a device — such as Vannoni aboard the Courier, and presumably the Courier's radar — is influenced by the distance separating the lead and the following vessel. However, the evidence in the instant case is either absent or muddled on the pivotal issues of size, speed and distance.

The only concrete evidence on the masking effect caused by the lead-vessel comes from Vannoni, but his testimony is problematic given his contemporaneous texting. Beyond that, there's little. The size of the lead vessel remains a mystery. Neither skipper nor any passengers aboard the Courier or MDOT provided an estimate. As I recall, the only one who even addressed the issue was Vourdouris who explained: "It was probably like a 21 to 25 foot boat. I really couldn't tell you. It was hundred of yards ahead of me . . . ." (Tr. at 206:1-3.)

The estimated speed of the lead vessel itself is also non-decipherable. Whether it was going 30 mph, 20 mph or 10 mph or at some other velocity is unknowable from the trial record.

On the all important issue of the distance between the lead vessel and the MDOT, conflicting evidence was adduced. Vourdouris estimated the distance at "maybe two, three football fields, something like that." (Id. at 207:11-20.) Consistent with that estimate, he testified the MDOT was never within the "prop wash," i.e. wake of the boat he was following. (Id. at 224:16-23.)

Vannoni, on the other hand, testified that he observed the lead vessel, not visually, but "as a green target with a tail" on his radar (tr. at 451:18 to 452:2), and determined that he could "safely . . . pass behind him, 20 to 40 yards." (Id. at 453:2-3.) But as he endeavored to do so, he collided with the port side of the MDOT. Although Vannoni was never asked specifically to estimate the distance between the "green target" and the Courier at the point of impact, seemingly, in his view, it was forty yards or less. The accuracy of that testimony, however, is again highly suspect due to Vannoni's texting at 2:36 A.M., as is the corresponding proposition that the MDOT was not visible on Courier's radar screen because of the wake phenomenon. It also warrants mention that deckhand Curtin, though called by FIF to testify, was never asked any questions about the nature of the wake presently under discussion. (See id. at 601:18 to 642:19 (Curtin's trial testimony in toto).)

For the foregoing reasons, the Court does not accept as convincing the proposition that the presence of the MDOT was obscured from detection by the wake of the vessel it was following. Accordingly, Vannoni's transgression was a proximate cause of claimants' damages. Had the Captain of the Courier not been texting it is likely he would have seen the MDOT either visually or on radar earlier than he did thereby lessening, if not avoiding, the resulting collision and damages.

B.  Claimants Have Established That the Courier
was Being Operated Without a Proper Lookout

15.  Title 33 C.F.R. § 83.05, entitled "Look-out (Rule 5)," provides that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."  Given the relatively small size of the Courier and that its captain was positioned close to the bow with virtually unobstructed views ahead (see Pet.'s Ex. 41), his service as both the Courier's operator as well as its lookout was not inconsistent with the requirements of Rule 5.

Claimants' argument that FIF was negligent in not using deckhand Curtin as an additional lookout is unconvincing based on both a reading of the rule and the attendant circumstances. Indeed, given that Courier was only carrying two passengers "no deckhand [was even] required to be onboard."  (Tr. at 781:21-25.) Perhaps, with power of hindsight, it would have been better had Curtin been tasked with the additional responsibility of serving as a second lookout but the failure of FIF to augment her assignment to include that function has not been shown to constitute negligence.

16.  The problem from FIF's perspective is not that Vannoni served as the sole lookout but that he did so negligently.  By texting moments before impact he failed to see

what almost certainly would have been visible to a reasonable person exercising appropriate caution had he been looking ahead, viz. the "white hull"[10] of the MDOT approaching from his starboard.[11]  Such a sighting would have been likely even though, as later discussed, the MDOT was operating absent illuminated running lights.  That is so, not only due to the light color of its hull, but because, as Vannoni testified, the conditions were "clear, very [c]lear, very calm."  (Tr. at 433:10; see also id. at 351:11 (testimony of claimants' expert Bates: "[the vessels] collided at night in clear visibility").)

16.  For the foregoing reasons, I find that Vannoni negligently performed his function as a lookout.

Attention will next be focused on FIF's allegations of negligence by Vourdouris, to be followed by a discussion of FIF's effort to limit its potential liability to the Courier's value of $200,000.

## C.  MDOT's Navigation Lights Were Not Illuminated at the Time of the Collision

18.  Vannoni testified that MDOT's navigation lights were not illuminated at the time of the accident. (E.g. tr. at 454:7-11.)  He observed, however, that immediately after the

---

[10]  (See Tr. at 450:23-24.)

[11]  Alternatively, as just discussed in the text, MDOT would have been seen on Courier's radar had Vannoni been watching the screen instead of texting.

collision, while the MDOT was "kind of spinning around . . . they put on a spotlight." (Id. at 455:12-14.)

19. Vannoni's testimony about MDOT's running lights not being illuminated dovetails with that of Christopher Kelly ("Kelly"). Kelly, at the time of the accident, was also a water taxi captain in the employ of FIF. (Tr. at 645:9-11.) Shortly after his shift ended "around 2:00 A.M.," and while waiting on Fire Island to be transported back to the mainland on board the Prowler, he heard the "captain of the Courier transmitting a Mayday off of buoy ten." (Id. at 646:2-24.) After an approximate "three minute run," the Prowler was alongside the Courier and the MDOT. (Id. at 647:6-21.) At that time no other vessels other than the Courier and MDOT were present. (Id. at 647:22-23.) Kelly, as both a first responder and an "EMT" boarded the MDOT for the purpose of assessing the condition of its passengers. (Id. at 648:8-17.)

Kelly was employed "as a firefighter with the Town of Greenwich, Connecticut and with the Ocean Beach police as a police officer" when he testified on September 22, 2016. (Tr. at 644:2-5.) I found him to be a particularly credible witness based, in part, on his demeanor while testifying and his background; that assessment is particularly important for present purposes since he said he saw no operational navigation lights on the MDOT when he arrived at the scene which was within minutes of

the accident.  (Id. at 648:3-7.)

20.  Sean Carlin, ("Carlin"), the "manager of [FIF's] water taxi company" (tr. at 703:4-8), was called to the stand by petitioner.  On July 10th, he heard Vannoni's radio call for assistance and responded to Buoy 10, arriving "[r]oughly 15 minutes" later.  (Id. at 713:6-18.)  By then, there were multiple vessels at the scene, including "a Suffolk County Police Department boat . . . as well as a United States Coast Guard boat."  (Id. at 713:21 to 714:1.)

Although Carlin saw "a search light [from the MDOT] shooting straight up in the air,"[12] he "didn't see any navigation lights on."  (Id. at 714:5-8.)

21.  As part of claimants' case, John Mullins, a police officer with the Suffolk County Police Department's Marine Bureau, provided information about his observations upon reporting to the accident scene.  He saw that "there was some damage to the port side of the [MDOT and] there was [sic] numerous people on board all complaining of injuries."  (Tr. at 283:20-22.)

22.  Mullins was on the stand briefly with only one question being asked of him as to MDOT's navigational lights:

---

[12]  Carlin's testimony about the spotlight is consistent Vannoni's recollection that right after the accident he "heard a lot of chatter about smoking and turn lights on" (tr. at 456:17-23), and a "spotlight" being activated (id. at 455:12-14).

Q. Did you observe anything about the
navigation lights on the Grady-White?

A. Not that I recall.

(Tr. at 283:23-25.)

Mullins also made reference to his July 10, 2011 police
report (Claimants' Ex. AA) wherein the officer reported that
Vannoni told him that "vessel number 2 [i.e., the MDOT] had no
lights [and that] he did not see the vessel [until] just prior to
the collision." (Tr. at 289:8-10.)

23. The only evidence that the MDOT's navigation
lights were on comes from claimants Vourdouris, Diaz and LaPera.
They claim that such was the case when they left Ocean Beach and
inferentially continued to be on until contact was made with the
Courier. (Tr. at 293:11-13, 302:20-22, 335:12-16.) That
contact, claimants urge, may have rendered the navigational
lights inoperable. "[M]ay" is the operative word in the last
sentence for nothing beyond an unsubstantiated hunch has been
furnished to support that proposition. Apparently no post
accident inspection was done of the MDOT – notwithstanding
Vannoni's contemporaneous complaint to Mullins about the vessel's
navigational lights – in an effort by claimants to confirm their
theory or, if done, the results were not shared with the Court.

24. There was testimony that the point of contact
between the vessels was on MDOT's port side at, or near the

location of the port navigation light.  (Tr. at 283:18-22.)  But whether that contact produced the result posited by claimants – including destroying the light on the other, i.e. starboard side – remains problematic.

25.  Vourdouris and his co-claimant-passengers left Captree State Park on the mainland for the trip across the bay at 9:48 P.M. on July 9th.  (Tr. at 779:12-13.)

GPS evidence indicates they "arrived at Ocean Beach at approximately 10:21 P.M., a trip duration of 33 minutes. [at] an average speed of just over eight miles per hour."  (Id. at 780:14-19.)

The MDOT left Ocean Beach at 2:30 A.M.  Among claimants' activities during that their four plus hours on Fire Island, was time spent at a "couple of bars" to the point where Diaz and LaPera both reported being "drunk" upon their return to the MDOT. (Id. at 328:19-329:3 (as to Diaz), 338:11-20 (as to LaPera).)

26. As to Vourdouris, he admitted that he had "one or two" alcoholic beverages "at most" while on Fire Island.  (Tr. at 202:9-16.)  But there is no evidence that he was intoxicated or otherwise physically impaired that evening.  (Id. at 285:11 to 286:15 (testimony provided by Police Officer Mullins).)  However, he did lack situational awareness as evidenced by, e.g., (1) his uncertainty as to whether he departed from Atlantique or Ocean

Beach for the trip back to Captree (id. at 201:1-23), (2) by electing to navigate through unfamiliar waters in the dead-of-night by following an unknown vessel operated by an unknown helmsman whose destination was also unknown at a speed in excess of twenty miles per hour, and (3) failing to see the Courier even after being advised of its presence by Diaz.

27.  Vourdouris' lack of situational awareness perhaps may help to explain his failure to activate the MDOT's navigational lights upon leaving Ocean Beach which I find to have been the case.  In any event, a preponderance of the credible evidence establishes that MDOT's navigational lights were not illuminated at the time of the collision.

D.    The MDOT was Operated Without a Proper Lookout

28.  FIF contends, and I so find, that the Courier's navigational lights were on as it approached Buoy 10.  Indeed claimants do not suggest otherwise.

29.  Even though, as earlier noted, there was "clear visibility" on July 10th in the vicinity of Buoy 10, Vourdouris, who presumably was the lookout, failed to see the Courier approaching from his left.  This was so even though Diaz warned Vourdouris several times over a period of up to ten seconds of the other vessel's presence prior to impact.  Yet Vourdouris, after looking to his left and inexplicably not seeing the Courier, simply continued on course.

30.  Simply put, Vourdouris' failure to see the properly illuminated Courier under the condition then prevailing, or to heed the relayed observations of Diaz, compels the conclusion that he conducted his function as lookout in a negligent fashion.

E.  Petitioner is not Entitled to Exoneration nor has it Established That Vannoni's Negligence was Beyond its Privity or Knowledge

31.  As earlier explained, claimants have established that the negligence of the Courier's Captain was a proximate cause of the July 10, 2011 collision and the alleged resulting injuries.  Accordingly, FIF is not entitled to exoneration.  Such being the case, attention will now be turned to the alternative form of relief sought by FIF, viz. to limit its liability to the $200,000 stipulated value of the vessel.  For that cap to be put in place, FIF must prove that any damages or injuries caused to any one or more of the claimants occurred "without [its] privity or knowledge."  46 U.S.C. § 30505(b).  The meaning of that statutory term is well synopsized in the following excerpt from In re Complaint of Messina:

> The phrase "privity or knowledge" is a term of art meaning complicity in the fault that caused the accident.  Privity and knowledge under the statute have been construed to mean that a shipowner knew or should have known that a certain condition existed.  In this case of individual owners, it has been commonly held or declared that privity as used in the statue means some personal participation of the owner in the fault or

> negligence which caused or contributed to the
> loss or injury . . . . Instead of being
> vicariously liable for the full extent of any
> injuries caused by the negligence of the
> captain or crew employed to operate the ship,
> the owner's liability is limited unless the
> owner himself had privity or knowledge of the
> negligent acts.

574 F.3d 119, 126 (2d Cir. 2009)(internal citations, quotation marks and emphases omitted.)

32. FIF endeavors to demonstrate its lack of privity and knowledge by noting that it has now, and had in July 2011, a general policy, well promulgated, albeit oral in nature, sufficiently broad to preclude texting in situations such as the present scenario. That policy, as explained by Carlin, the general manager of FIF's water taxi company, is that "if [a cell phone is] used, it would comply with the safe navigation of the vessel." (Tr. 716:17 to 717:1; see also id. at 433:16 to 434:1 (Vannoni's understanding of the policy as being basically to avoid all "unnecessary distractions while operating the vessel").) President Mooney amplified on that succinct description in responding as follows to a query from the company's counsel as to whether FIF had a cell phone policy:

> No, we don't. It's a tool within the
> wheelhouse, a tool that the captain has at
> his disposal. And we allowed the captains to
> make that decision on when there is
> appropriate time to use any device within his
> purview. We just treat it as another
> electronic device within the wheelhouse.

(Id. at 666:17-22.)

Is this oral omnibus policy without specific reference to cell phones, no less texting, sufficient to insulate FIF from potential liability beyond the value of the Courier?  In arguing that it is, FIF underscores the absence of a statute or Coast Guard regulation prohibiting texting while commercially transporting passengers by boat.  The absence of restricting regulations and statutes, however, can not, <u>ipso</u> <u>facto</u>, be dispositive of the issue for history tells us that there is often a significant time lag between development of new technologies and the enactment of measures to address associated dangers.  For example, cell phone texting was commonplace for several years before New York State outlawed the practice in 2009 for motor vehicle operators.  <u>See</u> N.Y. Veh. & Traffic Law, ¶ 1225-d.[13]

Admittedly the risk posed by using a cell phone while operating a motor vehicle on a roadway may differ from the danger created via similar conduct committed by the operator of a vessel.  Motor vehicles, inter alia, often travel at higher rates of speed in closer proximity to multiple neighboring vehicles, on the one hand, but do so typically along clearer marked lanes of with adequate nighttime lighting.  In addition, motorists are the

---

[13]  It is not that the subject of cell phone usage has escaped the concern of mariners.  Indeed Mooney acknowledged receipt of an advisory from the Coast Guard "about the danger of cell phone use by a vessel underway" (tr. at 678:20-21), and the subject of distracted operation has been "big issue" in boating circles since "before 2011" (<u>id.</u> at 678:1-3).

beneficiaries of effective braking systems in their vehicles unlike their boating counterparts.  Whether texting at night while operating a car or a boat hold more potential danger may be debatable and presumably depends on the surrounding circumstances.  But here it is undisputed that if the captain was texting at 2:36 A.M. as claimants have alleged that such conduct was negligent.

33.  Petitioner has not shown that its oral omnibus no distraction policy was an adequate response to the cell phone problem, particularly its texting component.  The proposition proffered by Mooney that a cell phone, is just another "tool" in the "wheelhouse," like "radar . . . GPS or the radio . . . ," and thus appropriately subject to the same oral policy, falls short of being convincing.  (Tr. at 662:17-25.)  It is roughly akin to the State of New York passing a statute requiring motorist to keep their "eyes on the road," and contending that such a broad-based admonition was an adequate legislative response to the driving while texting malady plaguing our communities.

34.  Moreover, Petitioner's inferentially equating such potentially distracting events as viewing radar screens and other navigational aids while underway, on the one hand, with texting on the other, ignores the fact that texting, unlike the other activities, may or may not be geared to assist a captain in safely transport passengers.  In fact, texting on personal

matters are, by the very nature, antithetical to that goal given the accompanying danger with no corresponding navigational benefit.

35.  As far as the nature of the 2:36 A.M. text, Vannoni does not recall its content (tr. at 479:11-12), nor does its recipient (id. at 1034:25 to 1035:2).  Petitioner is not in a position to fill that void because, notwithstanding the contemporaneous police and Coast Guard investigations, Vannoni was never asked by Petitioner to try and retrieve or otherwise uncover the substance of the text.  (Id. at 734:8-9, 479:16-18.) That being said, no suggestion has been made that the text was other than personal in nature.

36.  As noted supra, a shipowner will be unable to establish lack of knowledge "if it knew, or should have known that a certain condition existed," here, captains texting on personal matters while navigating FIF vessels.

Petitioner, which again bears the proof, did not present any evidence even suggesting that it was somehow unaware that its captains were engaging in the dangerous practice of using their cell phones for personal reasons while underway; to the contrary, what evidence there is on the subject indicates that FIF knew of the practice[14] and took no specific steps to address the associated dangers.  That makes the company complicit

---

[14]  (See, e.g., Tr. at 1032:17 to 1033:6.)

in the wrongdoing.

37.   In sum, Petitioner's reliance on their "one size fits all" distracted operation policy is found to be insufficient to insulate FIF from potential liability in excess of the Courier's value.

## Part V — Conclusion of Law

1.   Petitioner is not entitled to exoneration for the injuries said to be sustained by claimants as a result of the July 10, 2011 collision because a proximate cause of the accident was Vannoni's negligently texting immediately prior to impact.

2.   Vourdouris was also negligent in operating the MDOT without its navigational lights being illuminated and by not heeding the warnings provided by claimant Diaz of the approaching Courier near Buoy 10.  Even though the MDOT was the stand-on vessel, had Vourdouris had a proper lookout or acted reasonably in response to Diaz's repeated warnings presumably he could have avoided or, at the very least, lessened the severity of the impact.  His failure to do either, along with his operating MDOT sans navigational lights, constituted negligence.

3.   Given that both helmsmen were negligent, the question arises as to their respective percentages of fault. John Hegedorn ("Hegedorn"), a maritime expert and claimants' first witness at trial opined that both were at fault (tr. at 89:21-22), with the primary blame resting with Vannoni (id. at

90:23-25).  The Court agrees with the first part of that
assessment but finds — based on the findings of fact provided
earlier – that Vannoni and Vourdouris were equally at fault.

4.  As explained supra, Petitioner has failed to
establish that it lacked privity or knowledge and thus is not
entitled to cap its potential liability to the value of the
Courier.

Reported case law on the use of cell phones for
personal reasons in situations similar to the one at bar vis-a-
vis the issue of privity or knowledge — is virtually non-
existent.  The only decision cited by counsel or uncovered by the
Court's research is Holzhauer, a district court case from another
circuit which is presently pending appeal.  However, I found its
rationale and holding helpful.  The following excerpt evidences
some of similarities between the issues in Holzhauer and those
before me:

> The Court finds that the District has failed
> to meet its burden of demonstrating a lack of
> privity or knowledge.  The District had no
> policy regarding the use of personal cell
> phones by its captains.  The District also
> knew that its captains carried personal cell
> phones while operating the District's
> ferries, and permitted their use.  In this
> case, Captain Shonk, while operating the
> ferry SAN FRANCISCO, was actually using his
> cell phone immediately preceding the
> collision to speak with shoreside personnel.
> Therefore, the District cannot claim that its
> own lack of training or policy regarding the
> foreseeable use of a cell phone was beyond
> its privity or knowledge.  This is

> particularly true where, as here, the
> District had actual knowledge of the practice
> that led to the collision. Accordingly, the
> Court finds that the District failed to meet
> its burden of demonstrating a lack of privity
> or knowledge.

2016 WL 7242108, at *3 (transcript citations omitted).

CONCLUSION

For the foregoing reasons, FIF's petition for exoneration or, in the alternative to limit is liability, is denied.

SO ORDERED.

Dated: February 5, 2018
      Central Islip, New York

_____
DENIS R. HURLEY, U.S.D.J.